POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILTON LINHARES, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, THOMAS GOTTSTEIN, ULRICH KORNER, DAVID R. MATHERS, and DIXIT JOSHI,<br><br>                              Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Milton Linhares ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Credit Suisse Group AG ("Credit Suisse" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Credit Suisse securities, including the Company's AT1 Bonds, in a domestic transaction in the U.S., between February 18, 2021 and March 20, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

3.      In October 2022, Credit Suisse began experiencing a sharp increase in customer outflows, or withdrawals of client funds, after a series of quarterly losses and risk and compliance failures significantly decreased the Company's American Depositary Share ("ADS") price.

4.      Indeed, in an article entitled "Credit Suisse Warns of $1.6 Billion Loss After Clients Pull Money," published on November 23, 2022, the *Wall Street Journal* stated that "Credit Suisse Group AG warned it would lose around $1.6 billion in the fourth quarter after customers pulled their investments and deposits over concerns about the bank's financial health," that "Switzerland's No. 2 bank by assets said outflows were around 6% of its total $1.47 trillion assets, or around $88.3

billion, between Sept. 30 and Nov. 11," and that "the fast pace of withdrawals meant the bank's liquidity fell below some local-level requirements."

5.    On December 1, 2022, Credit Suisse's Chairman, Defendant Axel P. Lehmann ("Lehmann") stated in an interview with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

6.    The following day, in an interview with *Bloomberg Television*, Defendant Lehmann reiterated his previous statements, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped".

7.    Following Defendant Lehmann's statements, Credit Suisse's ADS price rose $0.29 per ADS, or 9.36%, to close at $3.38 per ADS on December 2, 2022.

8.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to Defendant Lehmann's representations in December 2022, the sharp increase in customer outflows Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) in addition, the Company maintained deficient internal disclosure

controls and procedures; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

9.      On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results.  The press release revealed that, contrary to Defendant Lehmann's prior statements, large customer outflows had continued through year-end 2022.  Specifically, the press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

10.      On this news, Credit Suisse's ADS price fell $0.56 per ADS, or 15.64%, to close at $3.02 per ADS on February 9, 2023.

11.      Then, on February 21, 2023, *Reuters* reported that the Swiss Financial Market Supervisory Authority ("FINMA"), was reviewing Defendant Lehmann's previous comments regarding customer outflows.

12.      On this news, Credit Suisse's ADS price fell another $0.10 per ADS, or 3.31%, to close at $2.92 per ADS on February 21, 2023.

13.      Then, on March 9, 2023, the Company issued an *ad hoc* announcement on Form 6-K stating it would delay the publication of its 2022 Annual Report and related Annual Report after a call on March 8, 2023 from the SEC regarding the

Company's cash flow statements in the years ended December 31, 2020, and 2019, as well as related controls.

14.     On this news, Credit Suisse's ADS price fell another $0.13 per ADS, or 4.48%, to close at $2.77 per ADS on March 9, 2023.

15.     Then, on March 14, 2023, the Company filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 20-F"), which identified material weaknesses in the Company's internal controls and procedures.

16.     On this news, Credit Suisse's ADS price fell another $0.03 per ADS. or 1.18%, to close at $2.51 per ADS on March 14, 2023.

17.     Then, on March 15, 2023, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing Saudi National Bank ("SNB") would not buy any more of the Company's shares on regulatory grounds.

18.     On this news, Credit Suisse's ADS price fell another $0.35 per ADS, or 13.94%, to close at $2.16 per ADS on March 15, 2023.

19.     Finally, on March 20, 2023, before market hours, the Company issued an *ad hoc* announcement on Form 6-K stating that, following the FINMA investigation, it had entered into a merger agreement with UBS.

20.    On this news, Credit Suisse's ADS price fell another $1.07 per ADS, or 52.99%, to close at $0.94 per ADS on March 20, 2023.

21.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

24.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Credit Suisse's most recent annual report on Form 20-F, as of the close of December 31, 2022, there were 3,941,250,081 of the Company's shares outstanding.  Credit Suisse's securities trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Credit Suisse's securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

25.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

26.    Plaintiff, as set forth in the attached Certification, acquired Credit Suisse securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

27.    Defendant Credit Suisse is a Swiss corporation with principal executive offices located at Paradeplatz 8, 8001 Zurich, Switzerland.  Credit Suisse's ADSs trade in an efficient market on the NYSE under the ticker symbol "CS".

28.    Defendant Lehmann has served as the Chairman of Credit Suisse's Board of Directors at all relevant times.

29.    Defendant Thomas Gottstein ("Gottstein") served as Credit Suisse's Chief Executive Officer ("CEO") from prior to the start of the Class Period until July 2022.

30.    Defendant Ulrich Korner ("Korner") has served as Credit Suisse's CEO since August 2022.

31.    Defendant David R. Mathers ("Mathers") served as the Company's Chief Financial Officer ("CFO") from prior to the start of the Class Period until April 2022.

32.    Defendant Dixit Joshi ("Joshi") has served as Credit Suisse's CFO since October 2022.

33.    Defendants Lehmann, Gottstein, Korner, Mathers, and Joshi are sometimes referred to herein as the "Individual Defendants."

34.    The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Credit Suisse's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Credit Suisse, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

35.     Credit Suisse and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

36.     Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

### Materially False and Misleading Statements Issued During the Class Period

37.     The Class Period begins on February 18, 2021, when Credit Suisse issued a press release announcing the Company's Q4 and full year 2020 results.  The press release quoted Defendant Gottstein, stating, in relevant part:

> Despite a challenging environment for societies and economies in 2020, we saw a strong underlying performance across Wealth Management and Investment Banking, while addressing historic issues. We remained focused on serving our clients around the globe and on delivering value to our shareholders. The steady execution of the strategic initiatives we announced last July supports our growth agenda and allows for further investment in our businesses. Looking forward into 2021 and beyond, we aim to further accelerate growth in Wealth Management and deliver sustainable returns in Investment Banking. We remain strongly committed to positioning Credit Suisse as a leader in sustainability and driving digitalization and automation to generate positive operating

leverage. I would like to thank all our employees for their outstanding commitment and loyalty.

38.     On April 22, 2021, Credit Suisse issued a press release announcing the

Company's Q1 2021 financial results.   The press release quoted Defendant

Gottstein, stating, in relevant part:

> Our results for the first quarter of 2021 have been significantly impacted by a CHF 4.4 bn charge related to a US-based hedge fund. The loss we report this quarter, because of this matter, is unacceptable. Together with the Board of Directors, we have taken significant steps to address this situation as well as the supply chain finance funds matter. Among other decisive actions, we have made changes in our senior business and control functions; we have enhanced our risk review across the bank; we have launched independent investigations into these matters by external advisors, supervised by a special committee of the Board; and we have taken several capital-related actions. We will work to ensure Credit Suisse emerges stronger. However, it is also important to recognize that our underlying 1Q21 financial performance2 , across all divisions, was strong, supported by solid results in Switzerland, and strong growth in APAC and investment banking. We expect that our successful MCN placement today will further strengthen our balance sheet and enable us to support the momentum in our core franchises. Our underlying result is a testament to the earnings power of Credit Suisse and to the commitment of our employees. And it makes it all the more important that we quickly and decisively resolve the issues we are currently dealing with.

39.     On July 29, 2021, Credit Suisse issued a press release announcing the

Company's Q2 2021 financial results.   The press release quoted Defendant

Gottstein, stating, in relevant part:

> Credit Suisse delivered resilient underlying second quarter results and strong capital ratios as we are benefitting from having taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters. We take these two events very seriously

and we are determined to learn all the right lessons. We have significantly reduced our RWA and leverage exposure and improved the risk profile of our Prime Services business in the Investment Bank, as well as strengthened the overall risk capabilities across the bank. Our underlying business performance remains solid with a record level of assets under management in our Wealth Management and Asset Management businesses, supporting strong growth in recurring commissions and fees. Together with our more conservative approach to risk and a less favorable trading environment compared to the second quarter of 2020, we delivered a resilient underlying performance in the Investment Bank. We continue to invest in people and technology across Wealth Management, notably in APAC, as well as Asset Management and the Investment Bank. Over the coming months, we will continue to develop our long-term vision for the bank that will serve as our compass for the years ahead. Our objectives are clear: whilst we aim to further strengthen our risk culture, we remain committed to serving all our private, corporate and institutional clients with best-in-class service and advice and to creating value for our shareholders.

40.     On November 4, 2021, Credit Suisse issued a press release announcing

the Company's Q3 2021 financial results.   The press release quoted Defendant

Gottstein, stating, in relevant part:

Credit Suisse reported strong third quarter pre-tax income and a CET1 ratio of 14.4 percent.

Wealth Management businesses returned to robust net new assets and higher transaction revenues sequentially, while recurring commissions & fees and client business volumes demonstrated strong year on year momentum. Our Swiss Universal Bank had a record third quarter performance. Our Asia Pacific business had a resilient performance notwithstanding deleveraging by clients and we continue to invest in the region, including in relationship managers and building-out our mainland China presence. Our Investment Bank delivered solid profitability driven by strong performance across Advisory, Capital Markets, Securitized Products and Equity Derivatives. Asset

Management reported a further improved underlying performance driven across all revenues lines.

We have also taken decisive actions to strengthen our overall risk & controls foundation, continued our remediation efforts on the Supply Chain Finance Funds matter, with our priority to return cash to investors, and made significant progress in resolving legacy issues. Our objectives are clear: we want to become a stronger, more customer-centric bank that puts risk management at the very core of its DNA to deliver sustainable growth for investors, clients and colleagues.

41.    On March 10, 2022, the Company filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 20-F").  With respect to the Company's controls and procedures, the 2021 20-F stated, in relevant part:

**Evaluation of disclosure controls and procedures**

The CEO and CFO concluded that, as of December 31, 2021, the design and operation of the Group's ***disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in reports filed and submitted under the Exchange Act is recorded, processed, summarized and reported as and when required***.

*** *** ***

Based upon its review and evaluation, management, including the Group CEO and CFO, ***has concluded that the Group's internal control over financial reporting is effective as of December 31, 2021***.

The Group's independent registered public accounting firm, PricewaterhouseCoopers AG, has issued an unqualified opinion on the effectiveness of the Group's internal control over financial reporting as of December 31, 2021, as stated in their report.

Changes in internal control over financial reporting

> ***There were no changes in the Group's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Group's internal control over financial reporting***.

(Emphases added.)

42.    On April 27, 2022, Credit Suisse issued a press release announcing the Company's Q1 2022 results.  The press release quoted Defendant Gottstein, stating, in relevant part:

> The first quarter of 2022 has been marked by volatile market conditions and client risk aversion. These conditions, together with the impact from our reduction in risk appetite in 2021 as we took decisive actions to strengthen our overall risk and controls foundation, had an adverse impact on our net revenues. Our operating expenses were higher year on year, driven in particular by higher previously reported litigation expenses of CHF 703 mn for the quarter as we continued our proactive approach to resolving litigation matters. Against this backdrop, we reported a pre-tax loss for the quarter; however, on an adjusted* basis, we reported a pre-tax income of CHF 300 mn, including the adverse impact of CHF 206 mn of losses related to Russia's invasion of Ukraine. 2022 is a transition year, and our clear focus remains on the disciplined execution of our new Group strategy as announced in November 2021: strengthening our core, simplifying our organization and investing for growth. We went live with our new structure in January; have reduced the allocated capital in the IB by USD 2.5 bn, 82% of our ambition of more than USD 3.0 bn; and have made significant progress on various other strategic priorities. I am confident that we are well positioned to build a stronger and client-centric bank that puts risk management at the core to deliver sustainable growth and value for investors, clients and colleagues.

43.    On July 27, 2022, Credit Suisse issued a press release announcing the Company's Q2 2022 results.  The press release quoted Defendant Gottstein, stating, in relevant part:

Our results for the second quarter of 2022 are disappointing, especially in the Investment Bank, and were also impacted by higher litigation provisions and other adjusting items. The bank's performance was significantly affected by a number of external factors, including geopolitical, macroeconomic and market headwinds. These challenging circumstances led to results which overshadow the strength of our leading client franchises in all four divisions of the bank. ***The urgency for decisive action is clear and a comprehensive review to strengthen our pivot to the Wealth Management, Swiss Bank and Asset Management businesses, supported by a fundamental transformation of our Investment Bank, is underway. Further, we have now launched a broader cost efficiency and digital transformation program to reduce our absolute cost base to less than CHF 15.5 bn in the medium term***.

(Emphasis added.)

44.    On October 27, 2022, Credit Suisse issued a press release announcing the Company's Q3 2022 results.   The press release quoted Defendant Korner, stating, in relevant part:

The third quarter, and more broadly 2022 so far, have been significantly impacted by the continued challenging market and macroeconomic conditions, leading to a weaker performance for our Investment Bank in particular. Our recent Group level performance has been disappointing for our stakeholders. From today, we are taking a series of decisive actions to re-focus Credit Suisse around the needs of our clients and stakeholders. Our new, integrated model will be focused on Wealth Management, the Swiss Bank, as well as Asset Management, and we will radically restructure the Investment Bank, strengthen capital, and accelerate our cost transformation. We believe these actions will lead Credit Suisse to a more stable performance and generate lasting value for our shareholders.

45.     On December 1, 2022, Credit Suisse's Chairman, Defendant Lehmann, stated in an interview streamed online with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

46.     That same day, *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm.'"  The article, which quoted Defendant Lehmann, stated, in relevant part:

> The chair of Credit Suisse said clients had started to return to the bank after pulling tens of billions of dollars of assets following a "social media storm" at the start of October.
>
> Axel Lehmann said withdrawals had flattened across the group and had started to reverse in the Swiss domestic business, but the scale of the outflows had caught the Swiss lender off-guard.
>
> "It was a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It was a storm in the retail and partially in the wealth management segment, in particular in Asia, where we had really massive outflows for two to three weeks.
>
> "The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."
>
> He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."
>
> Credit Suisse revealed last month that rich clients had withdrawn about SFr63.5bn ($67.4bn) since the start of October — equivalent to 10 per cent of wealth management assets — following a spate of social media rumours about its financial health.
>
> Spreads on the group's credit default swaps surged in early October, which indicated investors were becoming increasingly bearish on the

group, after a stream of rumours were posted on social media and web forums about the bank's imminent collapse.

\*\*\*

Lehmann and Körner, who worked as senior executives at UBS, have since set about devising a radical plan for Credit Suisse that will involve the bank cutting SFr2.5bn of costs, jettisoning 9,000 jobs and retreating from investment banking over the next three years.

\*\*\*

Lehmann added that the company had several "offers on the table" from companies that were willing to back the new venture and was in discussions with the US Federal Reserve over its balance sheet, structure and governance.

Credit Suisse had previously said an unnamed investor had pledged $500mn.

47.    On December 2, 2022, in an interview with *Bloomberg Television*, Lehmann reiterated his statements from the previous day, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped".  In the same interview, Lehmann characterized the October increase in customer outflows as simply a "two-to-three-week event."

48.    Following Defendant Lehmann's statements, Credit Suisse's ADS price climbed $0.29 per ADS, or 9.36%, to close at $3.38 per ADS on December 2, 2022.

49.    On December 8, 2022, Credit Suisse issued a press release "announc[ing] [a] successful rights offering."  The press release quoted Defendant Ulner, as stating, in relevant part:

> "Over recent weeks we have made important strides towards implementing the strategic actions outlined at our October 27 strategic review. The successful completion of the capital increase is a key milestone for the new Credit Suisse. It will allow us to further support our strategic priorities from a position of capital strength and create a simpler, more stable and more focused bank built around client needs, and generating value for shareholders."

50.    In response to this announcement, several market analysts published articles reporting on the impact of the successful rights offering.  For example, *Bloomberg* published an article entitled "Credit Suisse Offering Set to Sail Through After Wild Ride," which stated, in relevant part:

> Banks handling Credit Suisse Group AG's rights offer expect nearly all of those rights to be exercised, spelling success for a capital raise that looked shaky as recently as last week.

> Lenders arranging the deal currently expect investors to take up well above 90% of the stock on offer, the people said, asking not to be identified because the information is private. The banks don't currently anticipate needing to hold a sizeable amount of Credit Suisse stock on their books afterwards, according to the people.

> Any remaining amount is expected to be small enough that banks will be able to slowly sell the shares in the market, the people said. If needed, they will also be able to lean on sub-underwriters, major investors that have agreed to snap up a certain amount of unsold stock.

                                        ***

The bank is raising 4 billion francs in two steps to shore up its balance sheet as it seeks to put to rest concerns about its financial position after billions in losses over the past two years, recent client defections and asset outflows. The Saudi National Bank was an anchor investor in the capital raise, committing to invest about 1.5 billion francs, mostly through a private placement last month.

*** 

Credit Suisse needs the funds to help pay for the exit of large parts of its investment bank and 9,000 job cuts. The bank has warned that it will have a fifth straight quarter of losses as it reels from years of scandals and missteps that have eroded investor confidence and sent clients fleeing.

*** 

A successful rights offer spells the end of a wild ride for the troubled Swiss bank's stock over the past weeks, when at one point a 13-day losing streak took the shares down to near the price of what had supposed to be a heavily-discounted offer. ***Comments by Chairman Axel Lehmann on Friday that the bank had stopped massive outflows provided some relief, only for the stock to resume its downward slide on Tuesday***.

*** 

***Investors late last week took comfort from comments by Chairman Axel Lehmann that the main indicators of the bank's financial stability were strong and that its level of liquidity was improving after declines in recent weeks. The Zurich-based bank's liquidity coverage ratio, which measures the quantity of easily-sold assets available to meet obligations, is currently at 140%, Lehmann said***.

(Emphasis added.)

51.    The statements referenced in ¶¶ 37-47 and 49-50 were materially false and misleading because Defendants made false and/or misleading statements, as

well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to Defendant Lehmann's representations in December 2022, the sharp increase in customer outflows Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) in addition, the Company maintained deficient internal disclosure controls and procedures; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

52.    On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results and which revealed large customer outflows through year-end 2022. The press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

53.    On this news, Credit Suisse's ADS price fell $0.56 per ADS, or 15.64%, to close at $3.02 per ADS on February 9, 2023.

54.    Then, on February 21, 2023, *Reuters* published an article entitled "Exclusive: Credit Suisse chairman's comments draw scrutiny from financial watchdog -sources."  The article stated, in relevant part:

> The Swiss financial regulator is reviewing remarks made by Credit Suisse Group [] Chairman Axel Lehmann about outflows from the lender having stabilised in early December, two people with knowledge of the matter have told Reuters.
>
> Finma is seeking to establish the extent to which Lehmann, and other Credit Suisse representatives, were aware that clients were still withdrawing funds when he said in media interviews that outflows had stopped, said the two people, who asked to remain anonymous because the matter was not public.
>
> The development sent the embattled bank's shares down as much as 5% on Tuesday. The bank's stock, at roughly 2.62 Swiss francs, is around its lowest in decades. The cost of insuring exposure to the bank also rose following the news.
>
> A spokesperson for Finma declined to comment. A Credit Suisse spokesperson said the bank did "not comment on speculation." Lehmann did not reply to an email seeking comment.
>
> Lehmann told the Financial Times in an interview streamed online on Dec. 1 that after strong outflows in October, they had "completely flattened out" and "partially reversed".
>
> The following day he told Bloomberg Television that outflows had "basically stopped."
>
> Credit Suisse shares rose 9.3% on Dec. 2.
>
> The regulator is reviewing whether Lehmann's statements were potentially misleading, said the people, with one adding that Lehmann may not have been briefed correctly before he made those comments.

Luzerner Kantonalbank described the inquiry, although not a formal investigation, as another blow for Credit Suisse.

"Was Axel Lehmann insufficiently informed or did he consciously or did he deliberately gloss over the matter?" said analyst Daniel Bosshard.

"Whatever the case, this is yet another inglorious chapter in the history of Credit Suisse."

Credit Suisse said on Feb. 9, when it reported its annual results, that clients withdrew 110.5 billion Swiss francs ($119.65 billion) from Switzerland's second-largest bank in the last three months of 2022.

Those outflows exceeded market expectations and rounded off a weak set of results that led to the stock falling about 15% on the day.

In response to a question on the distribution of withdrawals in the period, Chief Executive Ulrich Koerner told analysts that day that more than 85% of the outflows in the last quarter were in October and November, according to a transcript of the call.

That led analysts at Citigroup to conclude in a note to clients that management effectively indicated 15% of the outflows happened in December. Finma's scrutiny adds to the challenges faced by Credit Suisse, which has been rocked by scandals in recent years. The lender has embarked on a sweeping overhaul to restore profitability by exiting certain investment banking activities and focusing on managing money for the wealthy. In early October a social media storm triggered by an unsubstantiated report about the bank's financial health prompted wealthy customers to move deposits elsewhere. The bank said at the time it was pushing ahead with its restructuring and remained close to its clients.

Responding to a Reuters request for comment on the Feb. 9 results, Finma said in a statement that while Credit Suisse's liquidity buffers had a stabilising effect, the regulator "monitors banks very closely during such situations," referring to the outflows, which "were indeed significant" in the fourth quarter. It did not elaborate further.

21

55.    On this news, Credit Suisse's ADS price fell another $0.10 per ADS, or 3.31%, to close at $2.92 per ADS on February 21, 2023.

56.    Then, on March 9, 2023, the Company issued an *ad hoc* announcement on Form 6-K stating it would delay the publication of its 2022 Annual Report and related Annual Report after a call on March 8, 2023 from the SEC regarding the Company's cash flow statements in the years ended December 31, 2020, and 2019, as well as related controls.

57.    On this news, Credit Suisse's ADS price fell another $0.13 per ADS, or 4.48%, to close at $2.77 per ADS on March 9, 2023.

58.    Then, on March 14, 2023, the Company filed the 2022 20-F with the SEC. With respect to the Company's controls and procedures, the 2022 20-F stated, in relevant part:

> **We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021**
>
> Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, ***the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective***.
>
> ***The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective***

*monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report.*

Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date. *While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition.*

(Emphases added.)

59. On this news, Credit Suisse's ADS price fell another $0.03 per ADS. or 1.18%, to close at $2.51 per ADS on March 14, 2023.

60. Then, on March 15, 2023, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing SNB would not buy any more of the Company's shares on regulatory grounds.

61. On this news, Credit Suisse's ADS price fell another $0.35 per ADS, or 13.94%, to close at $2.16 per ADS on March 15, 2023.

62. Finally, on March 20, 2023, before market hours, the Company issued an *ad hoc* announcement on Form 6-K stating its merger agreement with UBS. The announcement stated, in relevant part:

> Credit Suisse and UBS have entered into a merger agreement on Sunday following the intervention of the Swiss Federal Department of Finance, the Swiss National Bank and the Swiss Financial Market Supervisory Authority FINMA ("FINMA"). UBS will be the surviving entity upon closing of the merger transaction. Under the terms of the merger agreement all shareholders of Credit Suisse will receive 1 share in UBS for 22.48 shares in Credit Suisse. Until consummation of the merger, Credit Suisse will continue to conduct its business in the ordinary course and implement its restructuring measures in collaboration with UBS.
>
> ***
>
> Axel P. Lehmann said: "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant

legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

63.    On this news, Credit Suisse's ADS price fell another $1.07 per ADS, or 52.99%, to close at $0.94 per ADS on March 20, 2023.

64.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Credit Suisse securities, including the Company's AT1 Bonds, in a domestic transaction in the U.S., during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

66.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery,

Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Credit Suisse;

- whether the Individual Defendants caused Credit Suisse to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Credit Suisse securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Credit Suisse securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Credit Suisse securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

74.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

75.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

77.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Credit Suisse

securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Credit Suisse's finances and business prospects.

78.     By virtue of their positions at Credit Suisse, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Credit Suisse, the Individual Defendants had knowledge of the details of Credit Suisse's internal affairs.

80.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the

content of the statements of Credit Suisse.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Credit Suisse's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Credit Suisse securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Credit Suisse's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Credit Suisse securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

81.    During the Class Period, Credit Suisse securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Credit Suisse securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise

acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Credit Suisse securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Credit Suisse securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

84.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.    During the Class Period, the Individual Defendants participated in the operation and management of Credit Suisse, and conducted and participated, directly

and indirectly, in the conduct of Credit Suisse's business affairs.  Because of their senior positions, they knew the adverse non-public information about Credit Suisse's misstatement of income and expenses and false financial statements.

86.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Credit Suisse's financial condition and results of operations, and to correct promptly any public statements issued by Credit Suisse which had become materially false or misleading.

87.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Credit Suisse disseminated in the marketplace during the Class Period concerning Credit Suisse's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Credit Suisse to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Credit Suisse within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Credit Suisse securities.

88.    Each of the Individual Defendants, therefore, acted as a controlling person of Credit Suisse.  By reason of their senior management positions and/or

being directors of Credit Suisse, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Credit Suisse to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Credit Suisse and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Credit Suisse.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

34

D.    Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  April 21, 2023                    Respectfully submitted,

                                         POMERANTZ LLP

                                         <u>*/s/ Thomas H. Przybylowski*</u>
                                         Thomas H. Przybylowski
                                         Jeremy A. Lieberman
                                         (*pro hac vice* application forthcoming)
                                         J. Alexander Hood II
                                         (*pro hac vice* application forthcoming)
                                         600 Third Avenue, 20th Floor
                                         New York, New York 10016
                                         Telephone: (212) 661-1100
                                         Facsimile: (917) 463-1044
                                         tprzybylowski@pomlaw.com
                                         jalieberman@pomlaw.com
                                         ahood@pomlaw.com

                                         BRONSTEIN, GEWIRTZ &
                                         GROSSMAN, LLC
                                         Peretz Bronstein
                                         (*pro hac vice* application forthcoming)
                                         60 East 42nd Street, Suite 4600
                                         New York, New York 10165
                                         Telephone: (212) 697-6484
                                         Facsimile: (212) 697-7296
                                         peretz@bgandg.com

                                         *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.　　I, Milton Linhares, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.　　I have reviewed a Complaint against Credit Suisse Group AG ("Credit Suisse") and authorize the filing of a comparable complaint on my behalf.

3.　　I did not purchase or acquire Credit Suisse securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.　　I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Credit Suisse securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.　　The attached sheet lists all of my transactions in Credit Suisse securities during the Class Period as specified in the Complaint.

6.　　During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.　　I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

DocuSign Envelope ID: A58BCB58-911F-4C7F-85BB-809A55AF6DB4

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed:** April 21, 2023

**Milton Linhares**

**Credit Suisse Group AG (CS)**                                                        **Milton Linhares**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit/FV | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | H3698DDD3 | 5/4/2021 | 300,000 | $97.0790 |